1  OFFICE OF ROBERT SAINBURG, Attorneys
   Robert Sainburg [State Bar Number 157707]
2  620 North Brand Boulevard, Suite 405
   Glendale, California  91203-1266
3  Telephone:  (818) 550-5001
   Facsimile: (818) 550-5008
4  Firm e-mail: sainburglaw@sbcglobal.net

5  Attorneys for: Defendant ROBERT J. FISCHER

6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  FRANK L. RUDY, as an individual, and in his individual capacity as a shareholder of Western Mixers, Inc., | Case No. 2:10-cv04655JHN-PJWx c/w 2:11-cv-07220-JHN-PJWx |
| 12         Plaintiff, | DEFENDANT ROBERT J. FISHER'S NOTICE OF MOTION AND MOTION TO SET ASIDE CONSENT JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULE 60(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF HARLEY BJELLAND; DECLARATION OF ROBERT F. FISCHER; DECLARATION OF CHERYL FISCHER; DECLARATION OF ROBERT SAINBURG |
| 13     vs. | |
| 14  DAVID BOLSTAD, an individual; ROBERT FISCHER, an individual, | |
| 15         Defendants. | |
| 16 | |
| 17  HILDA L. SOLIS, Secretary of Labor, United States Department of Labor, | |
| 18 | |
| 19         Plaintiff, | [Filed and Served Concurrently with Table of Exhibits and Request for Judicial Notice] |
| 20     vs. | |
| 21  FRANK L. RUDY, DAVID H. BOLSTAD, ROBERT J. FISCHER, WESTERN MIXERS, INC., WESTERN MIXERS INC. MONEY PURCHASE PENSION PLAN, | Action filed:     June 23, 2010 Trial date:       Post-Judgment |
| 22 | Judge: Hon. Jacqueline H. Nguyen Ctrm:  790 |
| 23         Defendants. | |
| 24 | DATE:          December 10, 2012 TIME:           10:00 a.m. PLACE:         Courtroom 790 |
| 25 | |

26  TO HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES

27                                      1

28

1  DEPARTMENT OF LABOR, DAVID H. BOLSTAD, FRANK L. RUDY,

2  WESTERN MIXERS, INC., WESTERN MIXERS INC. MONEY PURCHASE

3  PENSION PLAN, THEIR COUNSEL, AND TO THIS HONORABLE COURT:

4      PLEASE TAKE NOTICE that on December 10, 2012 at 10:00 a.m. or as

5  soon thereafter as the matter may be heard, in Courtroom 790, of the United States

6  District Court for the Central District of California, located at 312 N. Spring St.,

7  Los Angeles, California  90012-4793, Defendant ROBERT J. FISCHER will

8  move to set aside the Consent Judgment, on just terms, pursuant to *Federal Rules*

9  *of Civil Procedure* Rule 60(b)(6).   Specifically, Defendant ROBERT J. FISCHER

10  wishes to be relieved of the Consent Judgment in its entirety.[1]

11      The grounds for this motion are that pursuant to *Federal Rules of Civil*

12  *Procedure* Section 60(b)(6), "[o]n motion and just terms, the court may relieve a

13  party or its legal representative from a final judgment for...any [] reason that

14  justifies relief."

15      The bases for this motion are as follows:

16  1.      The motion must be made within a "reasonable time."  "Reasonable

17          time" is dependent upon the facts in each individual case.  This

18          motion has been made within a reasonable time.  Moving Party has

19          serious health issues.  There has been obstruction and delay in

20          obtaining the Client Files.  Extensive efforts at informal resolution

---

[1]      Further, more particularly, unless the remaining parties agree to a
different agreement, this Consent Judgment will need to be set aside
as to all parties.  The crux of the problem itself is that the other
defendants have decreased their liability on the sum they agreed to
pay by taking Moving Party's pension plan and having Moving Party
pay part of their penalties.

2

were made.  All parties were on notice early on that Moving Party was investigating filing this motion.  There were years of case file boxes to review, after receipt, before brining motion and limited funding.  There has been no undue prejudice.

2.  Moving party has a meritorious defense.  Moving Party was not a fiduciary.  Moving Party had no discretionary authority over the pension plan.

3.  The court may relieve a party from a final judgment.   Rule 60 should be liberally construed and applied.  The court should relieve Moving Party from the Consent Judgment filed May 1, 2012.   Moving Party is, and has been, a very ill man.  Moving Party received worse than no legal representation - Moving Party's legal rights were trampled upon by his former attorneys.  Moving Party's former attorneys unethically represented him despite severe conflicts of interest.[2]  Moving Party was not counseled concerning the Consent Judgment's provisions forfeiting Moving Party's entire pension plan earned through his employment or payment of substantial penalties.

This motion shall be based upon this notice of motion, the accompanying memorandum of points and authorities, the accompanying declarations of Harley Bjelland, Robert J. Fischer, Cheryl C. Fischer, and Robert Sainburg, the Table of Exhibits and exhibits accompanying thereto, the Request for Judicial Notice and

---

[2]  This entire motion is largely based upon the unethical behavior of Moving Party's former attorneys.  Moving Party intends no disrespect nor intends any unduly inflammatory or accusatory behavior.  The crux of this motion, however, asserts unethical, or worse, behavior, by Moving Party's former attorneys.

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

1  items accompanying thereto, such matters to which the Court shall take judicial

2  notice and such further matters to which the Court may take judicial notice and to

3  which moving party duly requests such notice to be taken, such further evidence

4  and argument as may be presented in reply to any opposition to this motion, and to

5  such further evidence and argument as moving party submits and the court

6  receives prior to submission on this motion.

7          This motion is made following several conferences of counsel pursuant to

8  L.R. 7-3 which took place on August 17, 2012, September 7, 2012 and September

9  13, 2012.   The conferences of counsel took place within the context of extensive

10  written communications between the parties' counsel between July 2, 2012 and

11  September 17, 2012.

12                              Respectfully,

13

14                              OFFICE OF ROBERT SAINBURG,
                                Attorneys
                                            /s/
15  Dated:        11/6/12
                                by:    Robert Sainburg, Attorneys for ROBERT J.
16                                     FISCHER

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
of Civil Procedure Rule 60(b)(6)

# Table of Contents

Memorandum of Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    This Motion has been timely filed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Moving Party has serious health issues . . . . . . . . . . . . . . . . . . . . . 7

    B.    There has been obstruction and delay in obtaining Client File . . . . . 8

    C.    Extensive efforts at informal resolution were made . . . . . . . . . . . . 13

    D.    There were years of case file boxes to review, after receipt, before
        brining motion and limited funding . . . . . . . . . . . . . . . . . . . . . . . 14

    E.    There has been no undue prejudice . . . . . . . . . . . . . . . . . . . . . . . . 15

II.   Moving Party has a meritorious defense . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.    Moving Party was not a fiduciary . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  Moving Party should be relieved from the Consent Judgment . . . . . . . . . 18

    A.    Moving Party is, and has been, a very ill man . . . . . . . . . . . . . . . . 18

    B.    Moving Party's attorneys were grossly negligent . . . . . . . . . . . . . . 20

        1.    Moving Party never gave informed written consent to joint
            representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            A.    Moving Party's interests potentially and actually
                conflicted with those of Western Mixers and David
                Bolstad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        2.    Moving Party was coerced into signing the Consent
            Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

Table of Authorities

Page

Cases

*Clarke v. Burkle*

    570 F.2d 824 (8th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Community Dental Services v. Tani, DDS*

    282 F.3d 1164 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Falk v. Allen*

    739 F.2d 461 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Cremidas' Estate*

    14 F.R.D. 15 (D. Alaska 1953) . . . . . . . . . . . . . . . . . . . . . . . . 7, 14, 25

*Keegel v. Key West & Caribbean Trading Company, Inc.*

    627 F.2d 372 (DC Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lender v. Unum Life Insurance Company of America*

    519 F.Supp.2d 1217 (M.D. Florida 2007) . . . . . . . . . . . . . . . . . . . . . 18

*Price v. Seydel*

    961 F.2d 1470 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Smith v. Widman Trucking & Excavating, Inc.*

    627 F.2d 792 (7th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Statutes

29 U.S.C. Section 1002(21)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16

Rules

*California Rules of Professional Conduct*

    Rule 3-310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 20

    Rule 3-310(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

Table of Authorities (continued)

Page

Rules (continued)

*Federal Rules of Civil Procedure*

Rule 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 25

Rule 60(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18, 23, 25

Rule 60(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 25

Rule 60(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

At the time the Consent Judgment was entered, Robert J. Fischer was a gravely ill sixty two year old man in excruciating and chronic pain, heavily medicated, having suffered a massive heart attack, complications, several amputations, and having become partially non-ambulatory.

The Consent Judgment gives up all of Moving Party's life earned pension plan, forces Moving Party to pay $30,000 of penalties, and denies Moving Party of the benefits of the Department of Labor's efforts to recover deficiencies in funding of employee pension plans.

In order for Moving Party to have been liable for any of the company's funding deficiencies, he would have had to be found to have been a *fiduciary* as defined by 29 U.S.C. §1002(21)(iii).  Moving Party was *not* fiduciary.  Moving Party had zero discretionary authority over the pension plan.

Moving Party was jointly represented by two separate law firms.  These firms jointly represented the company, its shareholder, and Plan trustee, David Bolstad.  These firms ignored the requirements of *California Rules of Professional Conduct* Rule 3-310.

At no time:

- did Moving Party give his informed consent to either of these two law firms, from engagement to settlement
- was any discovery or motion prepared or served concerning Moving Party's threshold status as a fiduciary
- were the terms of the proposed Consent Judgment explained to Moving Party
- were Moving Party's rights, and need, to file a cross-complaint

1

1    against the company and its principals explained, much less filed

2    Moving Party was the victim of gross negligence, at best.   Moving Party's

3    attorneys effectively threw Moving Party under the bus and ignored his legal

4    rights, much less his grave medical condition.   His attorneys *of record* apparently

5    had no experience in ERISA law and refused to advise Moving Party and his other

6    attorneys disclaimed any responsibility for the case when it most mattered because

7    they were *not attorneys of record*.

8    This motion follows to relieve Moving Party from the Consent Judgment.

9    In doing so, it appears that the Consent Judgment will not be able to stand as to

10   any of the other parties because the DOL[3] will no longer have Moving Party's

11   pension plan and penalties to fund the funding deficiencies (at least not in the

12   amount agreed to between the DOL and the other parties, and their attorneys).

13                                    Background Facts

14   For a quarter of a century, Moving Party labored as an employee for

15   Western Mixers starting as a bookkeeper when he was in his young forties.

16   During this time, Moving Party, and his wife, dreamed of the day that they would

17   retire.   Steadfastly, Moving Party loyally abided by the directives of his employer,

18   Western Mixers, and its shareholders, Mr. Bolstad and Mr. Rudy, and throughout

19   the years, Moving Party watched his own pension plan grow.

20   One day, Mr. Bolstad and Mr. Rudy, began treating the pension plan as their

21   own personal piggy bank, to the tune of millions of dollars.   Moving Party kept

22   clocking in and out and in fact was given the exciting promotion to "Chief

23   Financial Officer."   It was in name only.

24   Then, Mr. Bolstad and Mr. Rudy, feeding their lavish personal lifestyles,

25   _____

26   [3]     United States Department of Labor

27                                          2

28   Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

1  stopped funding the pension plan altogether, and then, changed the compensation

2  agreement for all participants so that there would be no further funding required.

3  The company's gross revenues were over $25,000,000 per year.

4        One day, the DOL popped into the office and snooped around.  Apparently,

5  the DOL did not like what it found.  The investigation began.  Mr. Bolstad

6  provided his own handpicked attorneys who would represent Western Mixers and

7  Mr. Bolstad, in defense of the DOL's looming prosecution, and to represent

8  Moving Party - at no cost to Moving Party.[4]

9        Another day, Mr. Rudy, apparently breaking under the pressure, sued

10  Western Mixers, Mr. Bolstad and Moving Party claiming innocence by way of

11  ignorance.   This prompted the DOL to speed things up and the DOL hopped

12  aboard and sued all of the above, the Plan and Mr. Rudy.   The wrestle was on and

13  all during this time, Moving Party was represented by Mr. Bolstad's team of

14  lawyers.

15        Tragically, for Moving Party and his wife, Cheryl, on September 26, 2011

16  and after, Moving Party suffered a massive heart attack, amputations, and

17  complications, not to mention severe debilitating chronic pain, addictive narcotics,

18  and loss of mobility.  This happened on the eve of settlement and continues

19  through the moment, while Moving Party clings to his life and limb, literally.

20        Meanwhile, the swarm of attorneys and other parties were discussing

21  settlement, and someone had the great idea of using Moving Party's pension plan

22  to fund the deficiencies and to make Moving Party pay a major part of the

23  penalties.  This would mean that Mr. Bolstad, Mr. Rudy and Western Mixers

24

25     [4]     Mr. Rudy always marched to a separate drum, there being a rift

26         between he and Mr. Bolstad during this time period.

27                                 3

28

1   would have to pay less.  Indeed, Western Mixers had to pay zero in the settlement.

2   After all, the DOL alleged Moving Party is liable, and as "we fully control his

3   defense, so they will find." So, settlement it was and settlement it is.

4        Moving Party was wheeled in and about by a professional transport agency

5   provided by Mr. Bolstad to the only settlement conference but had to leave due to

6   severe debilitating pain and could not remain at the settlement conference.

7   Moving Party was accessed at his hospital bed after awakening post-amputations

8   and Moving Party did his best to communicate.  Literally these lawyers refused to

9   communicate with Moving Party when asked to explain the Consent Judgment.

10       Moving Party was coerced to sign the Consent Judgment under threat by his

11  lawyers that the DOL will come after he and his wife, that the DOL will take

12  everything they own, that Moving Party will be fired from his work and that

13  Moving Party will be left with *nothing*, all of this within the shrill of one of his

14  attorneys voice during the sole conference conducted about the Consent

15  Judgment's provisions requiring Moving Party to give up his pension plan and to

16  pay $30,000 in penalties, a telephone conversation of about ten minutes of

17  berating.  This led to Moving Party's shaky signature moments later that same

18  afternoon.

19       Well, apparently, after the ink on the Consent Judgment was dry, Mr.

20  Bolstad fired Moving Party and refused him his final paycheck ($48,000).  Mr.

21  Bolstad, and his attorneys, apparently, learned that Moving Party was being told

22  that he may have been tricked and duped by his attorneys.   So, Mr. Bolstad started

23  threatening Moving Party (and still does), to have Moving Party arrested based

24  upon claims of embezzlement and tries to outspend Moving Party including the

25  side show state court maneuver recently filed, aggressively litigated, and for which

26  Moving Party was the prevailing party.   Chicago-style.  It is well-documented.

27

28

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
of Civil Procedure Rule 60(b)(6)

Procedural History

On June 23, 2010, Frank Rudy (hereinafter, "Mr. Rudy") commenced a lawsuit[5] against David Bolstad ("Mr. Bolstad"), Robert J. Fischer (hereinafter, "Moving Party"), and others who were subsequently dismissed concerning pension plan issues. (Request for Judicial Notice, Item A[6]).  On July 21, 2010, August 17, 2010 and September 29, 2010, Seyfarth Shaw LLP firm (hereinafter, "the Seyfarth Firm") appeared on behalf of Mr. Bolstad and Moving Party.  (RJN-B, RJN-C, RJN-E)

On September 7, 2010, Mr. Rudy filed an amended complaint expanding the claims in the Rudy Lawsuit.  (RJN-D)  On October 8, 2010, P.K. Schrieffer LLP (hereinafter, "the Schrieffer Firm") through its attorney Tami Kay Lee (hereinafter, "Ms. Lee") substituted into the Rudy Lawsuit instead of the Seyfarth Firm.  (RJN-F).  On October 25, 2010, November 8, 2010, November 17, 2010, December 10, 2010, February 8, 2011, February 28, 2011, and September 9, 2011, the Schireffer Firm filed papers on behalf of Moving Party and Mr. Bolstad.  (RJN-G, RJN-H, RJN-I, RJN-K, RJN-L, RJN-M, RJN-N, RJN-R, RJN-T, RJN-X)

On November 11, 2010, a Joint Report of Early Meeting of Counsel was filed and signed by Ms. Lee on behalf of Moving Party and Mr. Bolstad. Although anticipated discovery is set forth, there is no mention of discovery concerning the fiduciary status of Moving Party.[7]  (RJN-J)  On December 21,

---

[5]   United States District Court for the Central District of California Case Number CV104655-JHN (PJWx) (hereinafter, "Rudy Lawsuit")

[6]   Hereinafter, "RJN-A"

[7]   And no discovery was ever obtained by the Schrieffer Firm about any issue.

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

2010, an Order was entered concerning various motions to dismiss (RJN-O)  On December 23, 2010, the Schrieffer Firm dismissed the Cross-Claim it had filed on behalf of Moving Party and Mr. Bolstad. (RJN-P)

On January 19, 2011, Mr. Rudy filed a second amended complaint further refining and expanding its claims.  (RJN-Q)  On February 15, 2011, the Court filed an Order Re: Jury Trial setting deadlines for discovery and making other orders.[8] (RJN-S)  On April 1, 2011, the Schrieffer Firm filed an answer on behalf of Mr. Bolstad and Moving Party.[9]  On July 11, 2011, a Court Order was filed granting a continuance of discovery deadlines.  (RJN-V)

On August 31, 2011, the DOL filed a lawsuit[10] against Mr. Rudy, Mr. Bolstad, Mr. Fischer, Western Mixers, Inc. (hereinafter, "Western Mixers") and Money Purchase Pension Plan concerning ERISA violations (hereinafter, "the Plan"). (RJN-W)  On September 14, 2011, the DOL filed a First Amended Complaint for Violations of ERISA.  (RJN-Y)  On September 15, 2011, the Court entered an Order continuing Trial as well as other deadlines.  (RJN-Z) On November 18, 2011, the Court entered an Order consolidating the Rudy Lawsuit and the DOL Lawsuit.  (RJN-AA) On December 27, 2011, the Schrieffer Firm filed an answer to the DOL Lawsuit on behalf of Western Mixers, Mr. Bolstad and Moving Party.  (RJN-BB)

---

[8]   No discovery was ever propounded on behalf of Moving Party.

[9]   The Court will see that at none of these heightened stages was Moving Party's informed consent obtained nor was Moving Party explained his legal rights and advised to seek independent counsel.

[10]   United States District Court for the Central District of California Case Number CV11-07220-JHN(PJWx) (hereinafter, "DOL Lawsuit")

On May 1, 2012, the Court entered the Consent Judgment which is the subject of this motion.  (RJN-CC)

Discussion

I.   <u>THIS MOTION HAS BEEN TIMELY FILED</u>[11]

*Federal Rules of Civil Procedure* Rule 60(c), in pertinent part, states, "A motion under Rule 60(b) must be made within a reasonable time...." "The only requirement as to time within the provisions of Rule 60(b)(6) is that it be reasonable." *In re Cremidas' Estate*  14 F.R.D. 15 (D. Alaska 1953)  "What constitutes reasonable time must of necessity depend upon the facts in each individual case." *In re Cremidas' Estate*  14 F.R.D. 15 (D. Alaska 1953)   In *Clarke v. Burkle* 570 F.2d 824 (8th Cir. 1978), six years was not an unreasonable time to file a Rule 60(b) motion under the circumstances.   The court, in quoting, stated that "'motions under Rule 60(b) involve a nice balance between the interest in finality and the desire to achieve justice.'" *id.* at 829 (quoting from 11 Wright & Miller, Federal Practice & Procedure, §2872, page 261).

A.   <u>Moving Party has serious health issues</u>

On September 26, 2011, Moving Party suffered a massive heart attack. Moving Party was brought back to life three times using the defibrillator, remained hospitalized for about two weeks, and was diagnosed with chronic heart ////

disease.  From September 26, 2011 through March 1, 2012, while recovering from the massive heart attack, Moving Party faced numerous additional health complications: Moving Party developed blue toe syndrome in both of his feet.

---

[11]     As this is an express requirement in Rule 60, the argument begins with this point.

7

1    This a circulatory problem resulted from lack of blood flow to Moving Party's toes

2    and caused severe, chronic pain pain and gangrene.

3         As this condition worsened over time in February 2012, four of Moving

4    Party's toes were amputated, part of Moving Party's foot was amputated and

5    Moving Party was prescribed and so ingested strong narcotics for his severe and

6    chronic pain.  Moreover, Moving Party has had severe and continuing pain

7    through the present, has suffered additional amputations, and further amputations

8    are expected, and/or, self-amputations (toes falling off) may occur.

9         As a result of the aforementioned severe medical conditions and resulting

10   complications, Moving Party has been minimally functional, physically,

11   emotionally, and mentally.  He is unable to drive, unable to walk unassisted, uses a

12   cane or a wheelchair, and most importantly, has been unable to focus on the

13   compelling issues of this lawsuit due to his constant battle for survival, his severe

14   and chronic pain, the serious continuing threat to his life, the strong narcotics, his

15   ambulatory nature, the time he has spent in hospitals and doctor's offices, and the

16   emotional turmoil of coming to terms with his own reality and mortality.

17        B.    There has been obstruction and delay in obtaining Client File

18        There has been a serious level of obstruction and delay in obtaining

19   cooperation, information and collecting the entire Client File.  In short, in order to

20   evaluate the facts for this motion, Moving Party needed his Client File.  As the

21   following detailed chronology illustrates, this turned out to be a nightmarish

22   process.

23        On July 2, 2012, Moving Party's new attorney, Robert Sainburg

24   (hereinafter, "Mr. Sainburg"), contacted Ms. Lee.  Mr. Sainburg identified himself

25   as Moving Party's new attorney, advised Ms. Lee that Moving Party needed

26   expedited attention and requested all engagement related documents. (Table of

27   28

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

Exhibits[12], Exhibit "1"[13])   On July 3, 2012, Ms. Lee acknowledged receipt of this request.  Ms. Lee referenced the engagement documents, but neither provided them, nor promised to provide them.  Ms. Lee made a comment that the opposing attorney, Rebecca Mocciaro (hereinafter, "Ms. Mocciaro"), worked alongside Ms. Lee in the litigation, and that the settlement was handled by the Seyfarth Firm. (E.2)[14]

On July 5, 2012, Mr. Sainburg made another request for all engagement related documents from the Schrieffer Firm.  Mr. Sainburg requested all communications between the Schrieffer Firm and Mr. Bolstad and/or Mr. Rudy since the original engagement, including all billing records, and specifically a copy of the Client File. (E.3, E.4)

On July 5, 2012, Mr. Sainburg wrote a letter to Nicholas Waddles (hereinafter, "Mr. Waddles") of the Seyfarth Firm and asked for confirmation of what Ms. Lee claimed as to his firm's representation of Moving Party, and if confirmed, to provide the entire Client File. (E.5)

On July 5, 2012, Mr. Sainburg and Ms. Lee spoke on the telephone. During that telephone conversation, amongst other comments, Ms. Lee informed Mr. Sainburg that she will <u>not</u> return most of Moving Party's Client File because most of the file was allegedly in the possession of Mr. Waddles.  Ms. Lee represented that Mr. Waddles also represented Moving Party in this lawsuit.  Ms. Lee further stated that she would not retrieve Moving Party's Client File from Mr.

---

[12]   Hereinafter, "TOE."

[13]   Hereinafter the abbreviated form "E.1" shall be used rather than the full form "Exhibit `1'."

[14]   All exhibit references are to the TOE unless otherwise indicated.

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

Waddles, that she would not provide any of the billings to Moving Party as those are owned by the co-defendant who she jointly represented, Western Mixers because Western Mixers paid for all of Moving Party's services and Ms. Lee further stated that she would only provide the documents that had Moving Party's name on it.  Ms. Lee also stated that she no longer represented Moving Party in any capacity.  (E.6)  On July 6, 2012, Mr. Sainburg wrote a letter to Ms. Lee confirming these verbal statements by Ms. Lee.  Mr. Sainburg also notified Ms. Lee that he still had not received the documents constituting Moving Party's Client File which were exigently needed.  Mr. Sainburg also communicated to Ms. Lee that he had not received a response from Mr. Waddles to Mr. Sainburg's inquires regarding any documents in his possession that might constitute part of Moving Party's Client File.  Mr. Sainburg again made an urgent request that Ms. Lee produce the entire Client File for Mr. Fischer.  (E.6)

On July 6, 2012, Mr. Sainburg again wrote a letter to Mr. Waddles asking for confirmation (or denial) that Mr. Fischer was or had been his client at any point in time, and again, if so, requested the timely return of Mr. Fischer's Client File, and even emphasized to Mr. Waddles that "time is of the essence" and that this matter required expedited attention. (E. 7)  On July 6, 2012, Mr. Sainburg received a letter from Mr. Waddles.  In the letter, Mr. Waddles wrote that the Seyfarth Firm "does not currently represent Mr. Fischer and never has in connection with the DOL lawsuit...."  (E.8)  The final paragraph appears to contradict this statement admitting that for some period of time, at least, the Seyfarth Firm did represent and advise Mr. Fischer, but just that it did not advise Mr. Fischer concerning the Consent Judgment or anything else since October

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

2010. (E.8)[15]

On July 9, 2012, Mr. Sainburg received a promise by the Schrieffer Firm to finally make a copy of the Client File available to Mr. Sainburg upon receipt of advance payment by Mr. Fischer of copying costs and unilaterally set the time to pick up the Client File *ten* (10) days later, on July 19, 2012, at 2:00 p.m. (E.9)

On July 9, 2012, Mr Waddles informed Mr. Sainburg that he has no Client File for Mr. Fischer. (E.10) Mr. Sainburg sent a letter to Mr. Waddles confirming his understanding of these facts and that despite Ms. Lee's statements, and Mr. Fischer's understanding, Mr. Waddles had no Client File of Mr. Fischer. (E.11)

On July 10, 2012, Mr. Sainburg made further attempts to get the entire Client File expeditiously produced (E.12) and advised the Schrieffer Firm that the Seyfarth Firm not only denies having most of Mr. Fischer's Client File, it denies having *any* of it. (E.10, E.11)  Further, on July 12, 2012, Mr. Sainburg demanded that the Client File be produced by the next business day. (E.13).  On July 17, 2012, Mr. Fischer received *some* of his Client File from Schrieffer Firm.

On July 18, 2012, Mr. Sainburg communicated again to Mr. Waddles about Moving Party's Client File due to the Schrieffer Firm's continued insistence that a significant part of the Client File was in the Seyfarth Firm's possession, as well as engagement related documents, billing documents, and electronic communications. (E.16)   Having no response from Mr. Waddles, on July 25, 2012, Mr. Sainburg again requested the Client File of Mr. Fischer.  (E.20) Needing the entire Client File to even comprehensively review the matter to bring this all-important and difficult motion, on July 30, 2012, Mr. Sainburg wrote an extensive communication to Mr. Waddles about the Client File. (E.23)

---

[15]    At a later date, Mr. Waddles admitted that this was incorrect.  (E.33)

On July 31, 2012, Mr. Sainburg also wrote an extensive communication to the Schrieffer Firm about the documents produced by them purporting to be the Client File (E.24).  Mr. Sainburg also wrote another letter to Mr. Waddles on July 31, 2012 requesting the Client File. (E.26)  On August 2, 2012, Mr. Waddles wrote Mr. Sainburg stating that Mr. Waddles is "currently reviewing" to see if the Seyfarth Firm has a Client File for Mr. Fischer and to the "extent [they] find any such documents, [they] will provide copies...by next Friday, August 10, 2012." (E.27) Mr. Sainburg responded incredulously to Mr. Waddles statement that it would be over one week more to produce the Client File over and above the close to six (6) weeks waited already.  (E.28)

On August 3, 2012, Mr. Sainburg received pages of Mr. Fischer's Client File from the Schrieffer Firm not previously provided.  (E.29)  Mr. Sainburg was expected to accept that this supplemental production adequately constituted the remaining part of Mr. Fischer's Client File.

Then, on August 9, 2012, Mr. Waddles reported that he "found" part of the Client File of Mr. Fischer.  Mr. Waddles, however, questioned Mr. Sainburg's authority to act on Mr. Fischer's behalf.  Mr. Waddles demanded, for the first time, written authorization directly from Moving Party.  (E.31)  On August 14th, Mr. Sainburg provided Mr. Waddles with the demanded authorization. (E.32)  On August 16, 2012, Mr. Sainburg received a letter from Mr. Waddles wherein Mr. Waddles admitted to significantly more representation of Mr. Fischer than previously admitted.  On August 17, 2012, Mr. Sainburg received a small portion of the Client File held by Mr. Waddles (as with Schrieffer Firm, conveniently and narrowly defined "Client File").  One more attempt was made on September 17, 2012 by Mr. Sainburg, to get Mr. Fischer's complete file from Mr. Waddles but to no avail.  (E.35, E.36)     This was a seven (7) to ten (10) week process to get Mr.

1  Fischer's Client File from two law firms.

2        C.    Extensive efforts at informal resolution were made

3        On July 16, 2012, Mr. Sainburg sought the DOL's stipulation to have the

4  Consent Judgment set aside.   Mr. Sainburg requested a response by July 20, 2012.

5  (E.14)   The DOL's litigation attorney, Andrew Schultz ("Mr. Schultz") replied

6  that he could not respond by July 20, 2012.   A copy was sent to other counsel.

7  (E.15)  On July 19, 2012, Mr. Waddles confirmed his firm's representation of

8  Western Mixers.  Mr. Waddles asserted that he and his clients have no position for

9  or against the instant motion.  (E.17, E.18)   On July 19, 2012, Frank Rudy's

10  attorney, Rebecca Mocciaro ("Ms. Mocciaro") stated that Mr. Rudy would not

11  agree by stipulation to the relief being requested and would oppose the motion.

12  (E.19)

13        On July 26, 2012, ten (10) days following Mr. Sainburg's request for the

14  DOL's stipulation, Mr. Schultz stated that it would be about another week for a

15  response. (E.21)  Mr. Sainburg sent a letter to Mr. Schultz on the same date with

16  further information to attempt to informally resolve this matter without the

17  substantial expense involved with a motion. (E.22)   Mr. Sainburg sent an

18  extensive communication to Mr. Schultz on July 31, 2012, attempting to get a

19  response and again to forego the need for this motion.  (E.25)   On August 3, 2012,

20  Mr. Schultz wrote to Mr. Sainburg and stated that the DOL needed more time to

21  respond to Mr. Sainburg's request for a stipulation to relieve Mr. Fischer from the

22  Consent Judgment.  (E.30)   On August 7, 2012, the DOL replied that it would not

23  stipulate to relieve Mr. Fischer of the Consent Judgment filed May 1, 2012.  A

24  conference was held between Mr. Sainburg and Mr. Waddles on or shortly after

25  August 17, 2012.   A second conference was held between counsel for DOL and

26  counsel for Moving Party's on September 7, 2012.   A third conference was held

27  13

28

1   on September 13, 2012 between Mr. Sainburg and Ms. Mocciaro.

2         None of these conferences resulted in any stipulation to relieve Moving

3   Party from the Consent Judgment on any terms.   Subsequently, Mr. Schultz, went

4   on extended leave and reportedly, Mr. Schultz is the only DOL attorney intimately

5   familiar with the litigation aspects of this case.  Mr. Schultz is not available to

6   address an opposition to this motion until end of November 2012 or beginning of

7   December 2012.

8         D.   There were years of case file boxes to review, after receipt, before

9              bringing this motion

10        After all was said and done, Mr. Fischer's new counsel, Mr. Sainburg, had

11  in his possession three (3) case file boxes to review and assimilate for this motion.

12  This itself was a monumental job after a decade of DOL investigation and two (2)

13  years of litigation.   The files were a mess and obviously sabotaged.  To date, they

14  were obviously cleansed and are missing important parts of the Client File.

15        Further, Moving Party has had *very* limited funds available to him for this

16  extensive work.   Mr. Fischer's entire pension plan has been swallowed by this

17  Consent Judgment - at least for the time being unless this Court grants this motion.

18  Mr. Fischer is being required to pay over $30,000 of penalties pursuant to this

19  Consent Judgment. Mr. Fischer was fired by Western Mixers.  Mr. Fischer's

20  wages were not, and have not, been paid, in a sum close to $50,000.   Mr.

21  Fischer's own pension deficiencies were never funded.  Mr. Fischer has faced

22  mountains of medical expense.  Finding that years having past was not an

23  unreasonable period under the circumstances, the court in *Cremidas Estate* 14

24  F.R.D. 15 (D. Alaska 1953) relied in part upon the fact that the moving party was

25  "without funds" to pay for legal services. *id.* at 240

26        E.   There has been no undue prejudice to any of the parties to the

27                                          14

1               Consent Judgment

2           Since at least June 20, 2012, Western Mixers and Mr. Bolstad were aware

3 that Mr. Fischer was going to seek counsel to possibly overturn the consent

4 judgment. (E.37)  If there was any doubt as to the seriousness, of course, this

5 doubt was placed to rest when Mr. Sainburg persisted to struggle over a two

6 month period with only partial success to obtain as much of the Client File as he

7 could wrestle from Mr. Fischer's prior attorneys, the Seyfarth Firm and the

8 Schrieffer Firm.  (E.1 through E. 36)   Certainly, therefor, if any prejudice has

9 occurred despite this early notice it is not for want of diligence and would not be

10 undue prejudice upon anybody if this Consent Judgment is set aside as to Mr.

11 Fischer or otherwise.

12          There has been *no* conceivable undue prejudice.   The consent judgment was

13 entered on May 1, 2012.  Less than two (2) months later, everything was out in

14 the open that Mr. Fischer was investigating challenging the Consent Judgment.

15 Extensive communications were undertaken to obtain the Client File and to obtain

16 voluntary stipulation to relieve Mr. Fischer of the Consent Judgment, neither of

17 which were completely successful.   There certainly has not been any prejudice of

18 significance - in the context of a two million dollar pension account with

19 numerous employees in a twenty five million dollar a year gross revenue business

20 - the accounting move from Mr. Fischer's pension of less than $200,000 of a

21 lifelong earned pension into the grips of the other employees of Western Mixers

22 rather than from Western Mixers or one of the two shareholders, Mr. Bolstad and

23 Mr. Rudy, surely there is no material difference if the Court is hearing this in

24 January 2013 or in August 2012.

25          Therefor, it is respectfully submitted that this motion has been filed within a

26 reasonable time period and timely.

27 15

28

II.    MOVING PARTY HAS A MERITORIOUS DEFENSE

    A.    Moving Party was not a fiduciary

       Moving Party has a defense to the complaint.   While this is certainly not the medium to prove Moving Party's entire defense, nor must Moving Party prove that there was a certainty, or even a probability of prevailing at trial, the Court could deny this motion if it found there was *no* merit to Moving Party's defense. *Price v. Seydel* 961 F.2d 1470, 1473 (9th Cir. 1992) ("'A district court has the discretion to deny a Rule 60(b)(1) motion…if … the defendant has no meritorious defense'" *quoting Meadows v. Domenican Republic* 817 F.2d 517, 521 *cert. denied,* 484 U.S. 976, 108 S.Ct. 486, 98 L.Ed.2d 485 (1987)

       Hence, in *Keegel v. Key West & Caribbean Trading Company, Inc.* 627 F.2d 372 (DC Cir. 1980), in finding a "meritorious defense," (*id.* at 375) the court stated, "Likelihood of success is not the measure.  Defendants' allegations are meritorious if they contain `even a hint of a suggestion'" which, proven at trial, would constitute a complete defense." *id.* at 374

       The entirety of the case by the DOL against Moving Party rested upon Moving Party being found to be a fiduciary as defined by 29 U.S.C. §1002(21)(iii) which reads, in pertinent part, as follows:

> "[A] person is a fiduciary with respect to a plan to the extent…he has any discretionary authority or discretionary responsibility in the administration of such plan…."

       Absent a finding after a trial that Moving Party was a fiduciary, no liability could be found against Moving Party.  It is important to note that at no time did Moving Party have any ownership interest in Western Mixers, nor was Moving Party ever a trustee of the pension plan.  Moving Party was given the title of Chief Financial Officer by Mr. Bolstad, but did not possess the authority of a Chief

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

1  Financial Officer, and did not have any discretionary authority over the pension

2  plan.

3          The DOL assumed, and Mr. Bolstad's attorneys, who also represented

4  Moving Party, did not make attempt to convince the DOL otherwise, that as Chief

5  Financial Officer, Moving Party had discretion **or** control over Plan assets.

6  Moving Party had *neither*.

7          Moving Party was added as a signator on the checking account for the Plan,

8  but, he was not permitted to write a check for any amount without the express

9  approval and direction of Mr. Bolstad and/or plan documents (with the sole

10  limited and defined expection of the direction to me to write qualifying loan

11  checks to members - but even then, normally Mr. Bolstad was consulted or

12  immediately advised) . Moving Party was in reality an employee with no

13  discretion concerning the administration, the operation, or the investment of the

14  plan. Rather than being the subject of enforcement by the DOL, who should be

15  one of the benefactors of the DOL's efforts.

16          As set forth in the attached expert declaration of Harley Bjelland, a

17  preeminent lawyer and specialist in ERISA liability, Moving Party was not a

18  fiduciary.  Moving Party had no discretion.  Moving Party was merely a pawn for

19  Western Mixers and its principals.   Moving Party had no authority or power to do

20  any of the acts alleged by the DOL.  Moving Party would lose his job if he

21  undertook any of the alleged acts without the specific direction by Mr. Bolstad.

22  Mr. Bolstad set Moving Party up as a dupe to help Mr. Bolstad pay for the

23  deficiencies created by Mr. Bolstad's and Mr. Rudy's actions.

24          The declaration of Moving Party sets forth in detail what makes an

25  overwhelmingly strong defense, much greater than required at this point.  While

26  neither the Court nor the DOL must accept as true every proposition asserted by an

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
of Civil Procedure Rule 60(b)(6)

28

1   interested party, it is doubtful that the DOL (or, any other party self-interested in

2   defeating the motion) could produce credible evidence adequate to establish that

3   Moving Party has no meritorious defense.  The DOL never interviewed or spoke

4   with Moving Party during this litigation.  Moving Party never had the opportunity

5   to explain his version of the facts to the DOL in response to the complaint.

6   Attorneys for Mr. Bolstad and Western Mixers informed DOL what happened

7   according to the best interests of Mr. Bolstad and Western Mixers and the DOL

8   accepted those statements as fact without independent verification.

9           Therefor, Moving Party has a meritorious defense.

10  III.   MOVING PARTY SHOULD BE RELIEVED FROM THE CONSENT

11          JUDGMENT

12          *Federal Rules of Civil Procedure* Rule 60(b), in pertinent part, states,

13  "On motion and just terms, the court may relieve a party...from a final

14  judgment...for the following reason[]:.... any [] reason that justifies relief."  "Rule

15  60 should be liberally construed."  *Lender v. Unum Life Insurance Company of*

16  *America* 519 F.Supp.2d 1217, 1223 (M.D. Florida 2007)  "Rule 60(b) is meant to

17  be remedial in nature and therefore must be liberally applied."  *Falk v. Allen* 739

18  F.2d. 461, 463 (9th Cir. 1984)

19          A.     Moving Party is, and has been, a very ill man

20          As already stated, Moving Party recently suffered a massive heart attack and

21  has continued to suffer for the last year numerous complications, including blue

22  toe syndrome in both of his feet, severe, chronic pain pain and gangrene, several

23  amputations, including toes and part of Moving Party's feet, strong narcotics, and

24  extraordinary related life issues.  Moving Party has been minimally functional,

25  physically, emotionally, and mentally, unable to drive, and unable to walk

26  unassisted.

27

28

18

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

In February 2012, Moving Party was unable to meaningfully focus to this case, was in severe and debilitating pain during the settlement conference resulting in his being professionally transported from the meeting, underwent multiple amputations, and was under the constant influence of strong narcotic medicine.

On March 23, 2012, while Moving Party's condition worsened, there was no communication by his attorneys, who were the company attorneys, and when presented with the settlement package for the first time, was denied any counsel about why suddenly Moving Party was being asked to forfeit his funded pension plan, pay penalties, and be denied the right to a trial instead of such a draconian result, which worked solely to the pecuniary favor of Mr. Bolstad and Western Mixers.

Within the environment of a gravely ill, medically demented, man, facing the mortality of prematurely leaving a surviving spouse, while in excruciating pain, the Schrieffer Firm declined to advise Moving Party, referring him to the Seyfarth Firm, who declined to comment, referring him back to the Schrieffer Firm, who, during a ten minute telephone call, berated and coerced Moving Party to sign the documents, and to obtain his wife's ERISA required spousal waiver, or face loss of employment and loss of everything he owned, and leave his surviving spouse with nothing.

Everything that is relevant to the Court's consideration of this Motion, both the events leading up to the Consent Judgment, and the preparation of this Motion, must, or should, be considered within this context.

////

////

////

////

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

B.    <u>Moving Party's attorneys were grossly negligent</u>

        1.    <u>Moving Party never gave informed written consent to joint representation</u>

*California Rules of Professional Conduct* Rule 3-310, in pertinent part, states:

"(A)   For purposes of this rule:

      "(1)    "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

      "(2)    "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure;

      "(3)    "Written" means any writing as defined in Evidence Code section 250.

"...

"(C)   A member shall not, without the informed written consent of each client:

      "(1)    Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

      "(2)    Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

      "...

"(D)   A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients without the informed written consent of each client.

"...

"(F)   A member shall not accept compensation for representing a client from one other than the client unless:

      "(1)    There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

      "(2)    Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

"(3)   The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

"(a)   such nondisclosure is otherwise authorized by law; or

"(b)   the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public."

A.   <u>Moving Party's interests potentially and actually conflicted with those of Western Mixers and David Bolstad</u>

Moving Party was an employee and by being sued by Mr. Rudy and the DOL, Moving Party had an interest, and indeed, a need, to file a countersuit against Western Mixers, Mr. Bolstad and Mr. Rudy for indemnification.   This created an actual conflict from the first day, not a potential one, much less one that is represented to Moving Party to be inconceivable by the attorneys.

Moving Party was a Plan member himself who had large deficiencies to his own pension plan.   This was known from the beginning of representation. Moving Party had the right to the DOL's protection, not prosecution.  Moving Party had the right to have his voice heard to the DOL, and to the Court if necessary.  The sole Plan trustees, Mr. Bolstad and Mr. Rudy, and the company, Western Mixers, could have been, and should have been, countersued for Mr. Fischer's deficiencies, and/or part of the pool of intended beneficiaries of the DOL's efforts.   These were actual conflicts, and were *never* explained to Moving Party, much less explained in writing as required.

Moving Party, who has no legal background whatsoever, does not know the perils of having his fees paid by a third party, and nor to have his right to have his confidences continue to be kept confidential regardless of who pays the bills. Moving Party's informed consent was not obtained by either the Schrieffer Firm or the Seyfarth Firm for allowing Mr. Fischer's legal services to be paid by Western

21

1   Mixers or Mr. Bolstad, which resulted in actual, not just potential, trampled upon

2   respect and protection... and adverse consequences to Moving Party.

3       When the settlement occurred, and Moving Party affixed his signature to the

4   Consent Judgment, Moving Party was never given informed consent about the

5   need for independent representation.   This not just ethically required, it extends to

6   the very heart of what happened here: Attorneys anxious to please their paying and

7   primary client, and principals anxious to use Moving Party's funded pension to

8   pay their own responsibilities, and to have Moving Party be responsible for a large

9   portion of the penalties, browbeat, tricked, and coerced an ill and unethically

10  represented client into submission and total loss of everything he had worked for

11  his entire career.

12      Indeed, this case was wrought with conflicts and both firms representing

13  Moving Party throughout, acted as though the conflict rules did not exist, or were

14  mere boiler provisions in a retention agreement.   Of course, no countersuit was

15  ever filed by Moving Party against Western Mixers, Mr. Bolstad or Mr. Rudy for

16  these legal rights of Moving Party.   Nor was Moving Party ever advised of the

17  option, the need, or to obtain independent representation.   Nor did Moving Party,

18  at the various stages of heightened actual conflict, with the *coup de grace* of the

19  Consent Judgment, ever give his informed consent to this representation.

20          2.    Moving Party was coerced into signing the Consent Judgment

21      On Friday, March 23, 2012, for the first time ever, the concept of Moving

22  Party's forfeiting his funded pension plan and the payment of substantial penalties

23  appeared in the proposed Consent Judgment.  This was done by Ms. Lee sending

24  Moving Party a copy of the proposed Consent Judgment and having a provision in

25  it with the sole advice, "Here you Bob...." (TOE, E.43).

26      When Moving Party contacted Ms. Lee on March 23rd, he was told to speak

27                              22

28

1   with Mr. Waddles.   Mr. Waddles, in turn told Moving Party that he would not

2   counsel Moving Party as he was not attorney of record, and to speak to Ms. Lee

3   (TOE, E.44)   On Monday, March 26th, Moving Party contacted Ms. Lee multiple

4   times.   When Ms. Lee finally spoke to Moving Party, Ms. Lee berated Moving

5   Party that if he did *not* sign, that the DOL would swoop down on him and take him

6   for everything that he was worth and that any hope for continued employment with

7   Western Mixers would be loss.   Moving Party fell apart and signed believing he

8   had no true choice.

9       In the Ninth Circuit opinion of *Community Dental Services v. Tani, DDS*

10  282 F.3d 1164 (9th Cir. 2002), the court held,

11          "Where...an attorney engages in grossly negligent conduct resulting in such
            a judgment, the client merits relief under <u>Rule 60(b)(6)</u>, and may not be held
12          accountable for his attorney's misconduct." *id.* at 1172

13      In the underlying case, Moving Party's attorneys were, at best, grossly

14  negligent in their advising Moving Party, if not maliciously committing

15  malfeasance.   All of this directly arose out of their numerous violations of the

16  conflict rules.   This included one of the most egregious violations of all, perhaps -

17  their absolute failure to even consider *California Rules of Professional Conduct*

18  Rule 3-310(D) requiring informed consent for Moving Party to enter into the

19  aggregate settlement while the attorney jointly represented other signatories,

20  Western Mixers and Mr. Bolstad, intended benefactors of Moving Party's

21  agreement.

22      The court in *Community Dental Services, supra,* addressed and dismissed

23  the raised concern that to distinguish between ordinary negligence and gross

24  negligence, that if Rule 60(b) motions can be granted based upon the gross

25  negligence of his attorney, "every client will simply argue that his counsel was

26  `grossly negligent.'" (*id.* at 1170) The court relied upon the fact that courts are

1    readily versed in distinguishing "between run-of-the-mill errors" and egregious

2    errors. *ibid.*

3           In the instant case, Moving Party, in grave health condition, was refused

4    counsel, requested thrice, before signing upon the coerced consent judgment,

5    through which Mr. Bolstad escaped not only One Million Dollars of personal

6    liability, penalties, and loss of property, but Western Mixers, a $25,000,000 annual

7    revenue generating company, escaped paying a penny towards the pension

8    deficiencies and seized the opportunity to have Moving Party's pension plan seal

9    the settlement gap and put a pretty bow ribbon on this case - at Moving Party and

10   his spouse's total loss.

11          Certainly, nothing about Moving Party was negligent, nor causal to the

12   matter, he himself clinging to life and limb, not to mention that he should have

13   been an employee for whom the DOL was protecting, not prosecuting, if only

14   Moving Party's attorneys *ever* fought on his behalf (which may have resulted in

15   harming the position of Mr. Bolstad and Western Mixers, as well as Mr. Rudy).

16          In the Seventh Circuit case of *Smith v. Widman Trucking & Excavating, Inc.*

17   627 F.2d 792 (7th Cir. 1980), the court affirmed the district court's Rule 60(b)

18   motion (under a different subsection 1) based upon confusion between attorneys

19   which led to a miscarriage of justice.   Whether the Wizard of Oz scarecrow

20   approach to Moving Party's request for help in which direction to go was the

21   cause of the woes, each attorney claiming that the *other* attorney was responsible

22   for advising Moving Party, this does not change the central fact that Moving Party

23   was forgotten in this litigation, and had all of his basic legal rights ignored by his

24   attorneys and Moving Party was thrown under the bus.

25          Indeed, not only has Moving Party's pension plan been given away to help

26   this mega company with its deficiencies, but Moving Party must pay over $30,000

27                                              24

28

1    in penalties.  At no time were these penalties even on the table, much less

2    suggested that Moving Party would ever have to pay them.  It was inserted in the

3    Consent Judgment of March 23, 2012 reducing the responsibility of Western

4    Mixers and Mr. Bolstad.  It was salt upon the wound.  It was now the backing up

5    of the imaginary bus upon Mr. Fischer.

6         In applying the law of Rule 60(b) motions so as to set aside an Order due to

7    his drunken attorney's ineptness in *Cremidas Estate* 14 F.R.D. 15 (D. Alaska

8    1953), the Court after noting that most Rule 60 motions involve *default*

9    judgments, stated, "[T]here is little difference between a judgment rendered

10   without a hearing and one rendered after a hearing in which counsel for one of the

11   litigants is in such condition as to not have the ability to properly represent his

12   client's interests."  *id* at 240   Clearly, irrespective of the pathology, neither the

13   Seyfarth Firm, nor the Schrieffer Firm, had the ability, or willingness, to properly

14   represent Moving Party's interests.

15                               Conclusion

16        Moving Party and Defendant ROBERT J. FISCHER respectfully requests

17   that the Court grant this Motion to Set Aside Consent Judgment Pursuant to

18   Federal Rules of Civil Procedure Rule 60(b)(6).

19                          Respectfully,

20                          OFFICE OF ROBERT SAINBURG,
                            Attorneys
21                                              /s/
     Dated:     11/6/12
22                          by:    Robert Sainburg, Attorneys for Defendant
                                   ROBERT J. FISCHER
23

24

25

26

27                                   25

     Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
28                               of Civil Procedure Rule 60(b)(6)

<u>Declaration of Harley Bjelland</u>

I, HARLEY BJELLAND, declare as follows:

1.    I am personally familiar with each and every fact set forth in this
declaration, except as to facts set forth on information and belief and as to
those, I am informed and based thereon believe that those facts are true, and
if called upon to do so, I would testify to the truthfulness of those facts set
forth herein on my own knowledge.

2.    I am an attorney at law duly licensed to practice law by the State of
California.

3.    I have extensive experience administering and operating plans both as an
advisor to public and private retirement plans as well as a member of the
benefits committee for four 100 plus attorney law firms as well as numerous
small law firms. I have drafted thousands of plan documents for qualified
retirement plans and non-qualified retirement plans. I have served as trustee
for plans and have served as a fiduciary on numerous benefit plan
committees. I have defended hundreds of audits by both the Internal
Revenue Service and the United States Department of Labor. I have served
as an expert witness on six federal court cases involving the operation,
administration and fiduciary obligations of qualified and non-qualified
retirement plans. I have served as fiduciary advisor for the Orange County
Employees' Retirement System, the Kern County Employees' Retirement
Association and the Alameda County Employees' Retirement Association as
well as hundreds of private sector qualified retirement plans. I have
lectured extensively on the management of fiduciary obligations and
fiduciary liabilities.

4.    I have been retained to determine whether Robert J. Fischer was a fiduciary

1

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
of Civil Procedure Rule 60(b)(6)

of the plan.  I have spoken with him and asked questions regarding his involvement with the plan and have read his declarations.  It is my opinion that Robert acted as a directed employee in regards to operation, administration of the plan and had no grantor powers with respect to the plan whatsoever.  He had no powers that would lead me to conclude that he was appointed or acted as a fiduciary of the plan.

5.   On hundreds of occasions I have examined whether an individual or individuals are fiduciaries of a qualified plan.  I have done this for both litigation matters and insurance coverage matters.

6.   It is my opinion that the United States Department of Labor ("DOL") was not aware of Robert's duties and his position with the company.  I believe that they saw that his title was that of Chief Executive Officer and presumed that, as such, he would typically possess and exercise fiduciary obligations under the terms of the plan.  It is also my opinion that had the DOL known Robert's true obligations it would treat him as a beneficiary of the forfeitures mandated by the DOL.

I certify under penalty of perjury that the foregoing is true and correct.  This declaration was executed on this 7th day of November 2012.

_____
Harley Bjelland

2

<u>Declaration of Robert J. Fischer</u>

I, ROBERT J. FISCHER, declare as follows:

1.   I am personally familiar with each and every fact set forth in this
     declaration, except as to facts set forth on information and belief and as to
     those, I am informed and based thereon believe that those facts are true, and
     if called upon to do so, I would testify to the truthfulness of those facts set
     forth herein on my own knowledge.

*Background information*

2.   I am sixty two (62) years old and have been married to Cheryl C. Fischer for
     thirty six (36) years (since 1976).  I was born in San Bernardino, California.
     I have a bachelor of science degree from Northern Arizona University.

3.   I was employed with Western Mixers from 1986 to 2012 and before that
     worked for David G. McFadden, CPA from 1975 to 1986.

4.   The only civil litigation that I have ever been a party to was the instant
     case(s) - the Rudy lawsuit (USDC 2:10-cv04655JHN-PJWx) and the DOL
     lawsuit (USCD 2:11-cv-07220-JHN-PJWX), the former dismissed, based
     upon information and belielt, upon conclusion of the latter by Consent
     Judgment filed May 1, 2012.

5.   I have neither been arrested nor convicted of any crime ever in my life.

*Serious health issues*

6.   On September 26, 2011, I suffered a massive heart attack.  I was brought
     back to life three times while the doctor worked on me, including with a
     defibrillator.   I remained hospitalized for about two weeks.   A stint was
     implanted.  I was diagnosed as having chronic heart disease.

7.   From September 26, 2011 through all of October 2011, my recovery seemed
     to be coming along well as far as my heart was concerned.  However, on

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
of Civil Procedure Rule 60(b)(6)

October 31, 2011, I went to see my primary physician because the two small toes on my left foot were turning black and blue, and I thought they were broken and they hurt a lot.  I was referred to Rheumatology.

8.   On November 7, 2011, I had his appointment with the Rheumatologist. Upon looking at my toes, the physician contacted the emergency room and my wife, Cheryl Fischer, took me to the emergency room (in Baldwin Park). Once admitted into the emergency room, and after tests were taken, and after being examined by various physicians, I was diagnosed with blue toe syndrom, a condition where my toes were not getting proper circulation.

9.   I went to several doctor appointments from November 7, 2011 through February 22, 2012 as the pain in my feet and legs worsened and the disease spread to both feet which turned into gangrene about midway through this period of time.   I was prescribed multiple narcotics to help with the pain.  It came to the point where I was even falling frequently out of bed.

10.   From mid-November through latter February 2012, I could only dose off for twenty (20) minutes or so, and then, the pain would wake me up and I would get up and try to walk around until some of the pain subsided, and then, twenty minutes of sleep and up again.  I literally became sleep deprived - and then, I would take more pain medications during this period not recalling how much I had already taken.  Then, I became addicted to pain medications and this was managed by my providers.

11.   During my February 22, 2012 appointment with the vascular surgeon, my wife, Cheryl, explained that she could no longer help me.  I was admitted to the hospital on February 22, 2012 where I was treated for the pain.  The conclusion was reached that I needed to have amputations to the worst toes and of parts of my feet.

2

12.  On February 27, 2012, I had the two small toes on each foot amputated and part of my left foot amputated and on March 1, 2012, I was discharged from the hospital.

13.  From March 1, 2012 through the present, I have been treated for the surgical wounds and the continuing pain.  I received home health care provided by Kaiser to have nurses visit me at home every couple of days to change the dressing on my feet.

14.  In July 2012, I had to have one more toe on my left foot partially amputated and I remains under doctor's care as I have anything but fully recovered.

15.  I am informed that I may have one more toe amputated and the physicians are waiting to see if it might self-amputate (fall off).

16.  Throughout this entire period, I have been on and continue to be on strong narcotics.  Attached to the TOE as Exhibit 38 is a true and correct copy of the print-out of the records kept in my online account with Kaiser Permanente relating my noted health conditions and prescribed medicines for the past couple of years.

17.  I have not been able to drive throughout this entire period of time.

18.  During this period of time, I have been able to function, at best, only a few hours per day.

19.  It has been difficult for me to give any attention to this lawsuit under these circumstances.   Where I was able to fulfill his bookkeeping and accounting type functions before the heart attack, focusing through the overwhelming pain, and through the narcotic influence, since that point through today, it has been very difficult.  I have been unable to be fully responsive to the needs of my new attorney in addressing these issues, and I can only attend to this lawsuit for a short period each day, much less sit inside my attorney's

3

1    office reviewing boxes of case files and help going over years of history.

2    20.   Prior to the heart attack of September 26, 2011, I always had a clean bill of

3          health.  I lived a normal productive and active life.

4    21.   Now I am confined to home, only going out for short periods of time, such

5          as to doctor's appointments or out to dinner.  I must use at least a cane to

6          walk, but if I travel for more than about 30 to 100 feet, I must use a

7          wheelchair.

8    *Obstruction by Former Attorneys*

9    22.   I have never signed any engagement agreement, informed consent waivers,

10         or third party pay forms, with Nicholas J. Waddles or Seyfarth Shaw LLP,

11         the firm with which Mr. Waddles is employed.  However, at all times during

12         this litigation, I believed that I was being co-represented and co-advised by

13         the Seyfarth Firm in settlement discussions with the United States

14         Department of Labor with the Schrieffer Firm.

15   23.   I have never signed any agreement to pay for the costs of copying my Client

16         File upon termination of either the Schieffer Firm or Seyfarth Firm's

17         employment.

18   *Meritorious defense*

19   24.   When I was first hired in 1986 by Western Mixers, I was the in-house

20         bookkeeper and I remained in house bookkeeper (with a title of "Chief

21         Financial Officer") until my employment was terminated on July 9, 2012.

22   25.   In the mid 1990's the then absentee Treasurer of the Company resigned and

23         I was given the title of chief financial officer, but none of my duties

24         changed except I became an authorized check signer for company checks.

25         As to the company (as opposed to the plan), I was given discretionary

26         authority to write checks.

27                                              4

28   Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
     of Civil Procedure Rule 60(b)(6)

26. While employed by Western Mixers, I was never allowed to unilaterally to make any decisions regarding any contracts of the Company. I was never able to choose any employee for my department or any department. Nor was I able to terminate any employees or establish salaries.

27. All contracts, mainly involving purchasing were never approved by me but were approved between the President and the buyers.

28. I was never allowed to establish policies for any Department within the Company. I was only able to make suggestions.

29. I was told on various occasions during my employment that I would be fired if I did not do as I was told by David Bolstad.

30. In many circumstances regarding purchasing large equipment or major company repairs, they were handled only by the chief executive officer and the Warehouse Manager and I knew nothing until receipt of an invoice. In some of those instances I never knew the purchase had been made as I would be bypassed and my signature would be written on the check for payment by the company's controller.

31. In the early 1990's I was assigned the duties of bookkeeping for the Companies' retirement plan. These duties had previously been done by the President of the Company and Trustee of the plan. I prepared financial statements, reconciled the bank account and estimated what the Annual Contribution should be by the company to the plan; however, I could not authorize that the Contributions be made. I could only present my Census report and suggest the Contribution be made timely.

32. Annually I would present my calculation of what was owed to the plan to the Co-Trustee, Mr. Rudy, and at the same time present Mr. Rudy his annual production report and show him that by him taking huge salaries for himself

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

1   he was putting the company at great risk because the cash flow did not

2   permit both his salary and the pension contribution.  I also brought this to

3   the attention of the Co-trustee, Mr. Bolstad but nothing was done about this

4   until Mr. Rudy had taken out in excess of $1.9 million. Finally the CEO

5   instructed me to cut Mr. Rudy's salary along with that of his assistant.

6   33.   Unfortunately this was too late to start making Plan Contributions. The two

7   trustees instead, amended the plan contribution to ZERO dollars. In effect,

8   freezing the plan.

9   34.   I could never authorize a contribution to the Plan made nor could I change

10   anything in regards to the terms of the plan. I had no authority of how the

11   funds were invested.  The terms of the Plan, administration of the Plan, the

12   contributions of the Company, and the investments of Plan assets were all

13   handled by the Trustees of the plan.

14   35.   Any checks signed by me were only at the directive of the Trustees or

15   according to the directives of the Plan Documents as was the case in regards

16   to Participants borrowing from their vested interest in the plan.  The sole

17   exception was the limited and defined direction to write qualifying loan

18   checks to members - but even then, normally David Bolstad was consulted

19   or immediately advised.

20   36.   The Plan allowed loans as long as the amount 1) did not exceed more than

21   $50,000 2) did not exceed more than 50% of the borrowing particpants

22   vested interest  3) must be repaid with in 5 years.  I had no authority to deny

23   any loans unless they did not meet the above requirements.

24   37.   All checks signed by me concerning the Plan were at the direction of David

25   Bolstad and/or plan documents and were never within my discretion.   The

26   distribution and deposits all such checks were at the direction of David

27

28

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
of Civil Procedure Rule 60(b)(6)

1    Bolstad.  I did not have the discretion, nor did I ever exercise the discretion,

2    how to distribute or deposit any checks that I signed concerning the Plan.

3    There was a time, for example, that I was Ordered by Mr. Bolstad to write

4    checks from the Plan in order to buy inventory for the Company.  If I had

5    not done so, I would have been fired.

6    38.    The DOL never interviewed or spoke with me during this litigation.  I never

7    had the opportunity to explain my version of the facts to the DOL in

8    response to the lawsuit.  There was never any independent verification of

9    what Mr. Bolstad's and Western Mixers' attorneys, who also jointly

10   represented me, represented to the DOL concerning me.   There was one

11   time, *ten* years ago, I spoke with a DOL investigator, and one time later

12   (long before the litigation) that I spoke with their subsequent investigator.

13   However, these two communications were always believed by me to be *only*

14   looking at Western Mixers and its principal's liability, and there was never a

15   mention by them of any potential liability by me.

16   *Unethical Conflict of Interest and Third Party Payment of Legal Fees*

17   39.    During most of the DOL and Rudy litigation, P.K. Schrieffer LLP was my

18   attorney of record, through primarily Tami Kay Lee, an associate attorney

19   for P.K. Schrieffer LLP (hereinafter "Schrieffer Firm").   Attached to the

20   TOE as Exhibits 39, 40, and 41, respectively, are true and correct copies of

21   the three, and only, conflict waiver communications and/or agreements that

22   I received from the Schrieffer Firm.

23   40.    Further, during all of the DOL and Rudy litigation, Seyfarth Shaw LLP,

24   predominately through Nicholas J. Waddles, negotiated on my behalf with

25   the DOL and Rudy lawyers, advised me, and consulted with the Schrieffer

26   Firm ("Seyfarth Firm").   I never received any conflict of waiver or payment

7

28

1      by third party of my attorney fees communications from the Seyfarth Firm.

2   41.   During all times of the Rudy and DOL litigation, both the Seyfarth Firm and

3      Schrieffer Firm jointly represented Western Mixers and David Bolstad at

4      the same time these firms represented me.

5   42.   I have never been billed for any legal services received by either firm.  I am

6      informed that the Seyfarth Firm and Schrieffer Firm were paid by Western

7      Mixers, David Bolstad, and, to some extent, I believe, by insurance.  I have

8      never been sent a bill for any legal services even though the retention

9      agreement entitles me to periodic statements regardless of who pays the bill.

10   43.   At no time was I ever advised that there was a potential or actual conflict of

11      interest between myself and David Bolstad or Western Mixers, but for what

12      is shown in the documents attached as exhibits hereteo.

13   44.   At no point did the Seyfarth firm ever advise me about the perils of joint

14      representation, whether in writing or verbally.

15   45.   At no time has there been any verbal disclosure by the Schrieffer Firm to me

16      of the pitfalls of joint representation.

17   46.   Neither the Seyfarth Firm nor the Schrieffer Firm ever sought my informed

18      consent in allowing a third party to pay my legal fees nor explained to me

19      that I had the right to have my confidences remain private despite third party

20      pay.

21   47.   At one point during the DOL and Rudy litigation, I brought up the subject

22      of indemnification by Western Mixers, David Bolstad and/or Frank Rudy

23      for what I was being subjected to and/or any liability assessed against me,

24      and I believe this occurred in a meeting with the Seyfarth Firm at Western

25      Mixers office in David Bolstad's presence and I believe it was shortly after

26      the DOL started its lawsuit.

27

28

48. I was simply told that there was no need for this as employment law called for my attorney fee to be paid for by Western Mixers and more such that indemnification would never happen.  During this discussion, Mr. Bolstad was becoming visably angry and upset.  I let the issue go.

49. At no time, including at the time period of February 2012 through March 2012, when apparently there was negotiation occurring that included giving up my pension plan and sacrificing my plan's deficiencies, in order to pay for Western Mixers' deficiencies to the other employees, was I told of the actual conflict or explained about the perils of joint representation.  Neither the Seyfarth Firm, who I am informed was directly involved with this negotiation, nor the Schrieffer Firm, who was my attorney of record, made any mention of the pitfalls of having the same attorneys represent me that were representing the interests of David Bolstad and Western Mixers.

50. At no time was I explained by either the Seyfarth Firm or the Schrieffer Firm that I had a right and/or that I should seek independent counsel to detemine whether I had a right, to sue Western Mixers and/or David Bolstad and/or Frank Rudy for the deficiencies to my plan, or for indemnification for any liability.

51. At no point was I explained that the defenses that I had to the DOL litigation may have contradicted the defenses that Western Mixers and David Bolstad had, and that my defense would have asserted that all actions that I took were at the direction of my employer.

52. When the Consent Judgment was entered into and when I signed it, I was never advised about the conflict of interest issue, or, the perils, or the need to have independent representation, by either the Schrieffer Firm or the Seyfarth Firm.

9

*Failure to Advise Concerning Waiver of Pension Plan*

53. Prior to receipt of part of my Client File from the Schrieffer Firm in July or August 2012, I had never seen the Telephone Memorandum dated February 22, 2012 attached to the TOE as Exhibit 42.

54. On February 10, 2012, there was scheduled a preliminary settlement conference, which had been scheduled for week, but in any event, a conference with all of the attorneys and most of the parties, to address settlement. However, I was unable to attend this conference, due to my medical condition, without transport significance. I had been medicated and in severe pain throughout this period.

55. Mr. Bolstad, after having been unsuccessful in having me give full and *carte blanche* settlement authority to my attorneys, obtained special transport for me and picked me up at home, placed me in a wheelchair, and wheeled me to the conference. However, after a short period of time, perhaps one hour, I was in so much incredible pain, I had to leave. Special transport was called and I was taken out in the middle of the meeting. Nothing was ever said or suggested about either my funded pension or my paying penalties. Attached to the TOE as Exhibit 49 is a true and correct copy of an email trail dated February 3, 2012 that was in my Client File obtained by Mr. Sainburg from the Schrieffer Firm.

56. On March 23, 2012, for the first time ever, the concept of my forfeiting my funded pension plan was raised, and it was done by sending me a copy of the proposed Consent Judgment and having a provision in it. This provision or concept was never ever raised or discussed previously with me.

57. I am informed and based thereon believe that the negotiations for the cases on my behalf, in fact, were handled predominately, if not exclusively, by

10

1    Nicholas Waddles, who was not the attorney of record, and with whom I did

2    not have an engagement agreement.  Many numbers and discussion were

3    had but at no time prior to March 23, 2012, had I ever been told that the

4    concept of my already funded pension plan, or any part of the funded plan,

5    would be sacrificed.

6    58.   The only concept remotely close to that concept, but categorically of

7          different import to me, was to waive the right to some, or even all, of the

8          deficiencies in funding to my plan, to which the other employee members of

9          Western Mixers, Inc. were being proposed to have relief.

10   59.   Apparently, at least on February 9, 2012, without my knowledge or consent,

11         my attorneys began to discuss digging into *my* pension plan in order to fund

12         the settlement requirements of the DOL.   Attached to the TOE as Exhibit

13         47 is a true and correct copy of an email communication that I found in the

14         portion of the Client File that I ultimately was able to retrieve from the

15         Schieffer Firm, that I had never seen before.  I did not prepare this

16         document myself and did not see it until months after entry of the judgment.

17   60.   Up and through the final settlement, there were substantial disparities and

18         disagreements, of several hundred thousand dollars between the defendants

19         and the Department of Labor.  When this final settlement was presented to

20         me on March 23, 2012, I was surprised to not only find the waiver of my

21         funded and earned pension plan, but that my attorneys had capituated on

22         almost all disagreements but at my personal expense.

23   61.   I am personally aware that Mr. Bolstad had lawlessly borrowed One Million

24         Dollars from the pension plan several years ago, which in some respects, he

25         ultimately paid back years later.  I believe that Mr. Bolstad was anxious to

26         have this settlement pass in part because it did not penalize him for this

27                                      11

28

1    action which could have resulted in Mr. Bolstad personally having to pay

2    $1,000,000 back based upon the significant appreciation of the building that

3    he financed with pension money, and because we were aware that the

4    Department of Labor may effectively claim an interest in the building that

5    he purchased by use of pension monies.

6    62.   Hence, prior to March 23, 2012, there were discussions to which I was privy

7          by which the principals (Bolstad and Rudy) had discussed a willingness to

8          forego part or all of *their* pension plans.  Western Mixers, Inc., however,

9          somehow by way of the Consent Judgment, a company with over 25 Million

10         Dollars of annual revenue, did not have to contribute a penny towards the

11         deficiencies or settlement.  Attached to the TOE as Exhibit 46 is a true and

12         correct copy of a document that I prepared which is a fairly accurate

13         portrayal the company's financial condition at the time of the settlement and

14         was prepared by use of information provided by Western Mixers and for the

15         company's accountant's preparation of its corporate tax returns.

16   63.   Attached to the TOE as Exhibit 43 is a true and correct copy of the email to

17         me from Ms. Lee with *the* Consent Judgment *and* Spousal Waiver with the

18         sole communication, "Here you Bob......"

19   64.   Upon receipt of the proposed Consent Judgment on March 23, 2012, I

20         contacted Tami Kay Lee and asked her why that provision was in there.

21   65.   Ms. Lee directed me to speak to Mr. Waddles about this provision.   Ms.

22         Lee would not provide me with any information.  Ms. Lee's position was

23         that Mr. Waddles was the one representing me concerning the pension plan.

24   66.   I contacted Mr. Waddles on the same day as I was rather concerned but Mr.

25         Waddles refused to provide me with any information stating that he was not

26         representing me in the litigation.  Attached to the TOE as Exhibit 44 is a

27                                              12

28

1     true and correct copy of the email trail between Mr. Waddles and me dated

2     March 23, 2012.   I did not receive his email until the evening of Friday,

3     March 23, 2012.

4    67.   On Monday, March 26, 2012, I contacted Ms. Lee and inquired about the

5       Consent Judgment and advised Ms. Lee that Mr. Waddles will not counsel

6       me.  But for a brief ten minute conversation, during which Ms. Lee berated

7       me in an angry tone that if I did not sign, that the Department of Labor

8       would swoop down on me and take me for everything that I was worth and

9       that my hope for continued employment with Western Mixers, Inc. would be

10      in peril in the absence of my signature.  Attached to the TOE as Exhibit

11      "45" is a true and correct copy of the billings from Ms. Lee for this time

12      period which do not even reflect the ten minute telephone call that I had

13      with Ms. Lee which directly resulted in my signature upon the Consent

14      judgment that same day and reflect no other communications with me since

15      March 23, 2012, except for the "Here you Bob" communication.

16    68.   I fell apart and signed believing I had no choice.

17    69.   I was never advised about the *tax* consequences of the Consent Judgment,

18      nor suggested to obtain separate professional advice about tax implications.

19      Shortly after July 5, 2012, I received, however, a letter advising me that I

20      "may owe federal and/or state income taxes" on the waiver and it was at that

21      time, that the plan attorney, Nicholas L. Saakvitne, "encouraged" that I

22      "discuss this with [my] tax professional."  Attached to the TOE as Exhibit

23      "48" is a true and correct copy of the letter dated July 5, 2012 received when

24      I first learned that I could be liable for a great deal of taxation.  This was

25      never explained to me, but means that not only has my retirement been

26      taken from me, but I may have to pay on this amount, potentially over

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
of Civil Procedure Rule 60(b)(6)

1    $200,000, *income taxes*.

2    70.   Further, I was never advised about the $30,000 plus penalty that I have have

3          to pay pursuant to the Consent Judgment. Indeed, to the contrary, I had

4          *always* been told by Mr. Waddles, that not only would I never have to pay

5          penalties, but that none of the defendants would ever have to pay penalties.

6          At no time prior to my receipt of the March 23, 2012 proposed consent

7          judgment had I any hint, suggestion or advice that not only was the pension

8          plan that I worked for since my young years being sacrificed, but I would

9          have to pay over $30,000 in penalties (against $4,000 being paid by Rudy, a

10         principal and a discretionary trustee!). I asked for a waiver months ago but

11         have heard nothing. I am not optimistic.

12   71.   Although I continued to be employed by Western Mixers following the

13         Consent Judgment, working from home as best as I could, my access to the

14         Western Mixers records was suddenly severed in June 2012, my health

15         insurance prematurely terminated triggering COBRA, and in early July

16         2012, my employment was terminated by Mr. Bolstad.

17   72.   On June 20, 2012, I had a telephone communication with Lee who informed

18         me that the Schrieffer Firm would no longer be representing me due to a

19         conflict of interest arising out of allegations being made against me by

20         David Bolstad.

21   73.   On or about July 3, 2012, I received a communication from Lee stating

22         (attached to the TOE as Exhibit "51" is a true and correct copy of this

23         communication):

24         a.    The Schrieffer Firm was withdrawing from representing me "pursuant

25               to instructions by David Bolstad"

26         b.    The reason for this withdrawal from representing *me* was because of a

27

28

1    "current conflict of interest due to pending allegations against [me] by

2    Western Mixers for embezzlement"

3    c.    "[T]he Consent Judgment is **finalized** (bold in original)"

4    d.    I have been advised "a number of times" that the Consent Judgment is

5          finalized (this is false - I had not even known that it had been signed

6          by the Court)

7    e.    That only Waddles was responsible for negotiation of the consent

8          judgment

9    f.    That the Schrieffer Firm was only responsible for the litigation

10         aspects of the Rudy matter

11   g.    That the Schrieffer Firm was not responsible for any negotiation of

12         the DOL litigation.

13   74.   On or about July 9, 2012, I received an email from Mr. Bolstad firing me

14         from my employment and suggesting that I was going to be arrested.   This

15         was shortly after I informed Ms. Lee about having hired Mr. Sainburg and

16         one week after Mr. Sainburg first contacted Mr. Lee on my behalf.

17         Attached to the TOE as Exhibit 52 is a true and correct copy of this email

18         dated July 9, 2012.

19   75.   Mr. Bolstad filed a *state action* against me (filed on October 11, 2012) after

20         my attorney, Mr. Sainburg, advised opposing attorneys that I was about to

21         file my motion in federal court (this motion) which again, depleted my very

22         limited funds, and even more limited energy, including having to respond to

23         an expensive prejudgment attachment proceeding filed against me.   Mr.

24         Bolstad (Western Mixers) lost the attachment, and then, dismissed the

25         action.   In that state action, I continued to receive innuendos that I will be

26         arrested if I do not shut up.   Attached to the TOE as Exhibit 53 is a true and

15

1    correct copy of the Court's docket sheet and a letter from Western Mixer's

2    new attorneys seeking to dismiss the case. I am informed that the case has

3    now been dismissed.

4    76.   In that state action, and the supporting declaration, Mr. Bolstad reports his

5          discovery of this alleged embezzlement to have been in February 2012,

6          prior to the settlement.

7    77.   I have not been paid apx. $48,000 of wages which I was advised in March

8          2012 by David Bolstad would be paid soon thereafter and that he wanted me

9          to continue to work from home, while gravely ill. I did the bookkeeping for

10         the 2011 taxes and related items, which took many hours, almost every hour

11         that I could provide under the circumstances. I was never paid and I have

12         substantial claims for this and penalties, I am informed.

13   78.   On October 15, 2012, I received a letter from another law firm from Illinois

14         which claimed that I owed its client $50,000 concerning some incident

15         involving Western Mixers.   I had never heard of any such incident and

16         believe this is bogus. But I have retained Mr. Sainburg to investigate and

17         address appropriately. Attached to the TOE as Exhibit 54 is a true and

18         correct copy of that letter.

19         I certify under penalty of perjury that the foregoing is true and correct. This

20   declaration was executed on this 6 day of November 2012.

21                                                    _Robert J. Fischer_

22                                                    Robert J. Fischer

23

24

25

26

27                                              16

28   Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules
     of Civil Procedure Rule 60(b)(6)

[ x ]

<u>Declaration of Cheryl C. Fischer</u>

I, CHERYL C. FISCHER, declare as follows:

1.    I am personally familiar with each and every fact set forth in this
      declaration, except as to facts set forth on information and belief and as to
      those, I am informed and based thereon believes that those facts are true,
      and if called upon to do so, I would testify to the truthfulness of those facts
      set forth herein on my own knowledge.

*Background information*

2.    I am sixty (60) years old, and have been married to Robert ("Bob") Fischer
      since 1976. I was born in Whittier, California, and hold a Bachelor of
      Science degree from California State University at Los Angeles. I have
      been a self-employed realtor for the last twenty four (24) years and was
      employed for ten (10) years before that with the Quaker Oats Company.

3.    Bob and I have one daughter, Erin C. Fischer, who has a Bachelor of Arts
      degree from University of California at Riverside.

*Serious health issues*

4.    On September 26, 2011, my husband, Robert ("Bob") Fischer, suffered a
      massive heart attack. After the heart attack, Mr. Fischer's toes began
      turning black and blue and Mr. Fischer was in increasing pain and
      discomfort. This pain continued to worsen through February 2012 and
      gangrene had set into both feet.   Mr. Fischer was taking narcotics to help
      with the pain.   I helped Mr. Fischer with his daily needs and medicine.   I
      witnessed Mr. Fischer falling out of bed on several occasions while he was
      suffering so horribly.   Finally, I could no longer help Mr. Fischer as his
      pain and suffering was far beyond anything that could be done for him at
      home.

1

5.    On February 22, 2012, I took Mr. Fischer to the doctor and Mr. Fischer was admitted into the hospital.  Subsequently, while still admitted, four toes and part of Mr. Fischer's foot was amputated.   This has been very painful, emotionally and physically, for Mr. Fischer, and emotionally for Your Declarant.

*Spousal Waiver*

6.    At no time was I contacted by either Ms. Lee or Mr. Waddles, or any other attorney, to either advise me concerning the implication of the spousal waiver, or, to suggest that this might be an important waiver for which I should seek counsel before signing.   I was handed this document by my very ill husband who asked me to sign it.   I regret having done so now as i may be left with no pension, not even my community interest.

I certify under penalty of perjury that the foregoing is true and correct.  This declaration was executed on this 6 day of November 2012.

*Cheryl C. Fischer*
Cheryl C. Fischer

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

[×]

Declaration of Robert Sainburg

I, ROBERT SAINBURG, declare as follows:

1.   I am personally familiar with each and every fact set forth in this
declaration, except as to facts set forth on information and belief and as to
those, I am informed and based thereon believes that those facts are true,
and if called upon to do so, I would testify to the truthfulness of those facts
set forth herein on my own knowledge.

2.   I am an attorney at law duly licensed to practice before all Courts within the
State of California, the United States District Court for the Central District,
and the Supreme Court of the United States of America.

*Obstruction and delay*

3.   On July 2, 2012, by mail and fax, I wrote Tami Kay Lee ("Ms. Lee") of PK
Schrieffer LLP ("Schrieffer Firm").   Attached to Defendant Robert J.
Fisher's Table of Exhibits in Support of Motion to Set Aside Consent
Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)
("TOE") as Exhibit "1" is a true and correct copy of this letter.  At this point
in time, My Client File consisted of only a few documents.

4.   On July 3, 2012, I received an email from Ms. Lee.   Attached to the TOE as
Exhibit "2" is a true and correct copy of this email.

5.   On July 5, 2012, by mail and fax, I again wrote Ms. Lee.   Attached to the
TOE as Exhibit "3" is a true and correct copy of this letter.

6.   On July 5, 2012 by mail and fax, I again wrote Ms. Lee.  Attached to the
TOE as Exhibit "4" is a true and correct copy of this letter.

7.   On July 5, 2012, by mail and fax, I wrote Mr. Waddles of the Seyfarth Shaw
LLP ("Seyfarth Firm") making inquiry as to Ms. Lee's claim that Seyfarth
Shaw LLP was Mr. Fischer's attorney at any point, and if so, to provide Mr.

1

1   Fischer's Client File, including all engagement related documents, and a

2   complete accounting of charges and payments.   Attached to the TOE as

3   Exhibit "5" is a true and correct copy of this letter.

4   8.   On July 5, 2012, I had a telephone conversation with Ms. Lee.  During that

5   telephone conversation, amongst other comments, Ms. Lee informed me that

6   she will not return all of Mr. Fischer's Client File because most of the file is

7   in the possession of an attorney by the name of Nicholas J. Waddles, from a

8   separate law firm, that according to Ms. Lee also represented Mr. Fischer in

9   this lawsuit.   Ms. Lee further stated that she would not retrieve Mr.

10   Fischer's Client File from Mr. Waddles.

11   9.   During this July 5, 2012 telephone conversation, Ms. Lee further stated to

12   me that Ms. Lee would not provide any of the billings to Mr. Fischer as

13   those are owned by the co-defendant who she jointly represented, Western

14   Mixers, Inc. ("Western Mixers") because Western Mixers paid for all of Mr.

15   Fischer's services.

16   10.   During this July 5, 2012 telephone conversation, Ms. Lee further stated that

17   she would only provide what had Mr. Fischer's name on it.   Ms. Lee also

18   represented that she no longer represented Mr. Fischer in any capacity.  Ms.

19   Lee did promise to forward the conflict of interest engagement form with

20   Mr. Fischer's signature on it.

21   11.   On July 6, 2012 by mail and fax, I again wrote Ms. Lee.  Attached to the

22   TOE as Exhibit "6" is a true and correct copy of this letter.

23   12.   On July 6, 2012, by mail and fax, I again wrote Mr. Waddles.  Attached to

24   the TOE as Exhibit "7" is a true and correct copy of this letter.

25   13.   On July 6, 2012, I received a communication from Mr. Waddles.   Attached

26   to the TOE as Exhibit "8" is a true and correct copy of this letter.

27

2

28

14.   On July 9, 2012, I received a communication from Mitchell J. Freedman and Paul K. Schrieffer of the Schrieffer firm.  Attached to the TOE as Exhibit "9" is a true and correct (and redacted) copy of this letter.  When I received this letter, it was on a Monday and it had already been a week since I requested the file.  I misread the letter and believed that a promise was being made to have the Client File available on the upcoming Thursday (July 12, 2012) - three (3)  days later - and did not notice, yet, that it was not being promised until ten (10) days later, July 19, 2012.

15.   On July 9, 2012, I received a communication from Mr. Waddles.   Attached to the TOE as Exhibit "10" is a true and correct copy of this letter.

16.   On July 9, 2012, by mail and fax, I wrote Mr. Waddles a letter.  Attached to the TOE as Exhibit "11" is a true and correct copy of this letter.

17.   On July 10, 2012, by mail and fax, I wrote Mr. Schrieffer and Mr. Freedman.  Attached to the TOE as Exhibit "12" is a true and correct redacted copy of this letter.

18.   On July 12, 2012, by mail and fax, I sent a communication to Mr. Schrieffer and Mr. Freedman.  Attached to the TOE as Exhibit "13" is a true and correct copy of this letter.

*Request for Stipulation and Further Interference and Delay*

19.   On July 16, 2012, by mail and fax, I sent a communication to Andrew J. Schultz, United States Department of Labor.   Also sent was a second letter correcting a statement in the first letter. Attached to the TOE as Exhibit "14" is a true and correct copy of these letters.

20.   On July 17, 2012, I received an email from Mr. Schultz.  Attached to the TOE as Exhibit "15" is a true and correct copy of this email.

21.   On July 17, 2012, my messenger picked up three (3) case file boxes from

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)

the Schrieffer Firm and delivered them to my office.

22. On July 18, 2012, by mail and fax, I sent a letter to Mr. Waddles.  Attached
to the TOE as Exhibit "16" is a true and correct copy of this letter.

23. On July 19, 2012, I received two letters from Mr. Waddles.  Attached to the
TOE as Exhibits "17" and "18 respectively are true and correct copies of
these two letters.

24. On July 19, 2012, I received an email from Ms. Mocciaro.  Attached to the
TOE as Exhibit "19" is a true and correct copy of this email.

25. On July 25, 2012, by mail and fax, I sent a letter to Mr. Waddles.  Attached
to the TOE as Exhibit "20" is a true and correct copy of this letter.

26. On July 26, 2012, I received an email from Mr. Schultz.  Attached to the
TOE as Exhibit "21" is a true and correct copy of this letter.

27. On July 26, 2012, I sent another letter to Mr. Schultz.  Attached to the TOE
as Exhibit "22" is a true and correct copy of this letter.

28. On July 30, 2012, by fax, email and mail, I sent another letter to Mr.
Waddles.  Attached to the TOE as Exhibit "23" is a true and correct copy of
this letter.

29. On July 31, 2012, by fax and mail, I sent another letter to Mr. Freedman and
Mr. Schrieffer.  Attached to the TOE as Exhibit "24" is a true and correct
copy of this letter (without the enclosures).

30. On July 31, 2012, by fax, email and mail, I sent another letter to Mr. Schulz.
Attached to the TOE as Exhibit "25" is a true and correct copy of this letter.

31. On July 31, 2012, by fax, email and mail, I sent another letter to Mr.
Waddles.  Attached to the TOE as Exhibit "26" is a true and correct copy of
this letter.

32. On August 2, 2012, I received a letter from Mr. Waddles.  Attached to the

4

1       TOE as Exhibit "27" is a true and correct copy of this letter.

2   33.   On August 2, 2012, by fax, email and mail, I wrote Mr. Waddles.  Attached

3       to the TOE as Exhibit "28" is a true and correct copy of this letter.

4   34.   On August 3, 2012, I received a letter that accompanied an overnight

5       package from the Schrieffer Firm with hundreds of additional pages

6       represented to be part of the Fischer client.  Attached to the TOE as Exhibit

7       "29" is a true and correct copy of this letter.

8   35.   On August 3, 2012, I received an email from Mr. Schultz.  Attached to the

9       TOE as Exhibit "30" is a true and correct copy of this letter.

10  36.   On August 7, 2012, I was communicated to in writing from Mr. Schultz that

11      the DOL would not stipulate to relieve Mr. Fischer from the Consent

12      Judgment.

13  37.   On August 9, 2012, I received a communication from Mr. Waddles.

14      Attached to the TOE as Exhibit "31" is a true and correct copy of this letter.

15  38.   On August 14, 2012, by fax, email and mail, I sent a communication to Mr.

16      Waddles, with an authorization.  Attached to the TOE as Exhibit "32" is a

17      true and correct copy of this letter and authorization.

18  39.   On August 16, 2012, I received a communication from Mr. Waddles and on

19      or about August 17, 2012, I received some documents from Mr. Waddles

20      that were part of Mr. Fischer's file with the Seyfarth Firm (represented to be

21      the entirety of the Client File).  Attached to the TOE as Exhibit "33" is a

22      true and correct copy of this letter.  I telephoned Mr. Waddles following this

23      letter and he stated that he would speak with his client about the matter but

24      this did not ultimately remove the need for this motion.

25  *Preparation of Motion and Pre-filing Conference*

26  40.   At this point, during the last half of August 2012, I commenced preparation

27                                          5

1     of the underlying motion.

2   41.   However, being previously unfamiliar with the rules of federal practice, on

3        September 6, 2012, while completing the motion, I learned of Local Rule 7-

4        3 which required an explicit pre-filing face to face, or telephonic conference

5        (despite the above history) which must be completed at least ten days *before*

6        filing the motion.

7   42.   Attached to the TOE as Exhibit "34" is a true and correct copy of a letter

8        sent to all counsel concerning having such a conference dated September 6,

9        2012. The conference was conducted on September 7, 2012. No change of

10        position was obtained.

11   43.   A further L.R. 7-3 conference with Ms. Mocciaro was conducted on

12        September 13, 2012 but no change of position was obtained and no

13        stipulation reached.

14   44.   On September 17, 2012, I sent a letter to Mr. Waddles by fax. Attached to

15        the TOE as Exhibit "35" is a true and correct copy of this letter.

16   45.   On September 17, 2012, I received a letter from Mr. Waddles. Attached to

17        the TOE as Exhibit "36" is a true and correct copy of this letter.

18   46.   Attached to the TOE as Exhibit "37" is a true and correct copy of a

19        document entitled "Telephone Memorandum" dated June 20, 2012,

20        provided with the Client File provided by the Schrieffer Firm to me.

21   47.   I am informed, and based thereon believe, that Mr. Schultz, the handling

22        litigation attorney on this matter, has been on extended leave and will not be

23        available to address this motion until end of November 2012 to beginning

24        December 2012. It is my understanding that no other attorney for the

25        Department of Labor was handling the litigation aspect of this case.

26   *Case File Review*

27

28  

48.  After months of waiting, some of the Client File had been received.  While it was clearly cleansed, and substantial portions withheld, several case file boxes of documents were obtained, after ten (10) years of DOL investigation, and two (2) years of federal litigation.

49.  Reviewing the file and applicable law on this matter took a substantial amount of time.  Choosing the pieces of evidence that would show the Court the horrendous injustice that had been played against Mr. Fischer, from mountains of documents, was a time consuming event.

50.  At a certain point, I had to decide to go forward with the motion in the absence of substantial parts of the Client File.  The Schrieffer Firm's and Seyfarth Firm's narrow and self-serving interpretation of what a Client File is, and their spending many weeks in delaying me obtaining the Client File, had to be finally accepted in practice, and the motion reviewed on the basis of half-files and half-information.

51.  I am a sole practitioner and am working on this case on a shoestring budget and the scores of hours spent on this matter to date had to be spread out somewhat while information was gathered, assimilated, and put into motion form.  The preparation of this motion was exasperated by Mr. Fischer's unavailability due to his health problems, plus my own general unfamiliarity with federal litigation, much less ERISA litigation, the difficulties and inability to get the Client File from former counsel, and the gravity as to what is stake in this proceeding for Mr. Fischer and his wife.

*Conflict of Interest*

52.  Attached to the TOE as Exhibit 42 is a true and correct copy of a Telephone Memorandum dated February 22, 2012 received with the partial file eventually produced by the Schrieffer Firm.

53.    My review of the Client Files provided shows that there was no discovery obtained by any of Moving Party's attorneys and no motions filed concerning Moving Party's fiduciary status, as well as no cross-complaints filed by Moving Party against any of the jointly represented defendants.

 I certify under penalty of perjury that the foregoing is true and correct.  This declaration was executed on this   6th day of November 2012.

/s/

_____
Robert Sainburg

Defendant Robert J. Fisher's Notice of Motion and Motion to Set Aside Consent Judgment Pursuant to Federal Rules of Civil Procedure Rule 60(b)(6)